No. 26-1542

# In the United States Court of Appeals for the Sixth Circuit

ROBINHOOD DERIVATIVES, LLC,

*Plaintiff-Appellant,*

v.

DANA NESSEL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MICHIGAN; JIM ANANICH, IN HIS OFFICIAL CAPACITY AS BOARD CHAIR OF THE MICHIGAN GAMING CONTROL BOARD; JONI M. THROWER DAVIS, IN HER OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; ANDREW T. PALMS, IN HIS OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; DEIDRE A. LAMBERT-BOUNDS, IN HER OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; MARK EVENSON, IN HIS OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; AND HENRY L. WILLIAMS, JR., IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE MICHIGAN GAMING CONTROL BOARD,

*Defendants-Appellees*,

*On Appeal from the United States District Court for the Western District of Michigan, No. 1:26-cv-00730 Hon. Paul L. Maloney*

## BRIEF OF *AMICUS CURIAE* THE COALITION FOR PREDICTION MARKETS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

ELIZABETH B. PRELOGAR
*Counsel of Record*
EPHRAIM A. MCDOWELL
ELIAS S. KIM
DEV P. RANJAN
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae Coalition for Prediction Markets*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record states that, as a nonprofit entity organized under § 501(c)(6) of the Internal Revenue Code, amicus curiae Coalition for Prediction Markets has issued no stock. Consequently, no parent corporation nor any publicly held corporation could or does own 10% or more of its stock.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Amicus Curiae*
*Coalition for Prediction Markets*

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......... i

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION .......... 3

ARGUMENT .......... 4

I. Prediction Markets Serve Critical Economic Functions .......... 4

 A. History and Mechanics of Prediction Markets .......... 5

 B. Prediction Markets Have Significant Economic Benefits .......... 9

  1. Prediction markets help forecast events by aggregating knowledge from diverse sources .......... 10

  2. Prediction markets allow market participants to mitigate risks .......... 15

II. Prediction Markets Are Not Sportsbooks .......... 17

 A. Sportsbooks Operate Differently from Prediction Markets .......... 17

 B. Any Functional Similarities Between Prediction Markets and Sportsbooks Have No Legal Significance .......... 20

III. Exclusive Federal Regulation Of Prediction Markets Is The Only Sensible Approach .......... 22

 A. The CFTC Correctly Treats Prediction Markets as Productive Mechanisms for Aggregating Information .......... 23

 B. State Gambling Regulations Are a Mismatch For Prediction Markets .......... 28

 C. Applying State Laws to Prediction Markets Would Have Detrimental Consequences .......... 31

CONCLUSION .......... 35

CERTIFICATE OF COMPLIANCE .......... 37

CERTIFICATE OF SERVICE .......... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 12

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) .......... 24

*Chi. Bd. Options Exch., Inc. v. SEC*,
889 F.3d 837 (7th Cir. 2018) .......... 19-20

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .......... 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 24

*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005) .......... 19

## Statutes

7 U.S.C.
§ 1a(27) .......... 22
§ 1a(47) .......... 21-22
§ 1a(47)(A) .......... 27
§ 2(a)(1)(A) .......... 3, 21
§ 5(a) .......... 23
§ 5(b) .......... 23
§ 7(d)(3) .......... 26
§ 7(d)(4) .......... 26
§ 7(d)(8) .......... 26
§ 7(d)(9)(A) .......... 26

15 U.S.C.
§ 78c(a)(68) .......... 21
§ 78bb(a)(3) .......... 21

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Act of March 19, 1931,
1931 Nev. Stat. 165 .......... 29

An Act to Prohibit Gambling,
1861 Nev. Stat. 53 .......... 29

CFTC Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 .......... 25

Commodity Futures Modernization Act,
Pub. L. No. 106-554, 114 Stat. 2763A (2000) .......... 8

Dodd-Frank Wall Street Reform & Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......... 8, 25-26

Grain Futures Act,
Pub. L. No. 67-331, 42 Stat. 998 (1922) .......... 23, 25

Minn. S.F. 4760, 94th Leg. (2026) .......... 31

TN Code § 4-49-125(h) .......... 30

**Rules & Regulations**

17 C.F.R. § 38.151(b) .......... 19, 26

*Prediction Markets; Public Interest Determinations*,
91 Fed. Reg. 35806 (June 12, 2026) .......... 14

Mich. Comp. Laws.
§ 432.402(d) .......... 29
§ 432.406(6) .......... 29
§ 432.406(9) .......... 30

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Mich. Admin. Code R.
432.731(1) .... 30
432.731(2) .... 30
432.753(1)(i) .... 30
432.753(2)(a) .... 30

**Other Authorities**

Ananth Madhavan, *Market Microstructure: A Survey*, 3 J. Fin. Mkts. 205 (2000) .... 19

Anna Betts, *'You Can Bet On It': Utah Lawmakers Form United Front in Push to Ban Prediction Markets*, The Guardian (May 18, 2026) .... 32

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fin. & Econ. Discussion No. 2026-010 (Bd. of Governors of Fed. Rsrv. Sys. 2026) .... 9, 12-14, 19

Caleb Tallman, *Kalshi's Next Bet: Institutional Hedging for Professional Sports Teams*, Gaming Today (Feb. 23, 2026) .... 16

Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026) .... 16-17

Celso Brunetti & Bahattin Buyuksahin, *Is Speculation Destabilizing?* (Apr. 22, 2009) .... 27

CFTC, *Understanding Prediction Markets and Event Contracts* (last visited May 25, 2026) .... 6

Catherine McGrath, *Trump leads Harris on Robinhood's new prediction market with 100 million contracts traded*, Fortune (Nov. 4, 2024) .... 13

Daniel Defoe, *The Gamester: A Benefit-Ticket for All That Are Concern'd in the Lotteries* (London, J. Roberts 1719) .... 21

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Emily Giambalvo, *Americans Can't Stop Betting. Sportsbooks are Cashing In*, Washington Post (Oct. 9, 2025) ................................ 18

Erik Snowberg et al., *Prediction Markets for Economic Forecasting*, Brookings (June 13, 2012) ............................................ 11

F.A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) ........................................................10-11

FINRA, *Insurance Agents* (last visited June 6, 2026)............................. 22

Fox Corp., *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, Reuters (Apr. 7, 2026) ...............13-14

*How to Get a Sports Betting License in the USA: A State-By-State Guide (2025)*, Sports Betting Soft (last visited June 23, 2026) ......................................................................................... 32

Ian Frisch, *Prediction Markets and Casinos Go to War Over Sports Betting*, N.Y. Times (Feb. 7, 2026).................................... 20, 32

Jean A. Webb, Sec'y, CFTC, *Application of HedgeStreet, Inc. for Designation as a Contract Market* (Feb. 18, 2004).......................... 8

John L. Smith, *A Nevada Leader Who Warned Us About Our Excesses*, L.V. Rev.-J. (Mar. 19, 2011)................................................ 28

Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285 (2008).................................... 8, 10, 13

Justin Wolfers et al., *Interpreting Prediction Market Prices as Probabilities* (Nat'l Bureau of Econ. Rsch., Working Paper No. 12200, 2006)........................................................................ 6

Justin Wolfers et al., *Prediction Markets*, 18 J. Econ. Persp. 107 (2004) ......................................................... 5, 11

KalshiEX LLC, *Rulebook* (last visited June 22, 2026)............................ 28

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Kaitlyn Radde, *Trading Volume on Prediction Markets Has Soared in Recent Months*, Pew Research Center (May 27, 2026) .......... 9

Karl Whelan, *On Prices and Returns in Commercial Prediction Markets*, 23 Quantitative Fin. 1699 (2023) .......... 6

Kenneth J. Arrow et al., *Economics: The Promise of Prediction Markets*, 320 Science 877 (2008) .......... 9-10

Liz Hoffman, *A Soccer Team Bet Against Itself. This is the (Good) Future of Prediction Markets*, Semafor (June 4, 2026) .......... 16

Mahdieh Shamsi et al., *A Prediction Market Trading Strategy to Hedge Financial Risks of Wind Power Producers in Electricity Markets*, 36 IEEE Trans. Power Sys. 4513 (2021) .......... 15

Martin Spann et al., *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds, and Tipsters*, 28 J. Forecast 55 (2009) .......... 18

Max Rego, *Kalshi Puts Paxton Odds in Texas GOP Primary at 95 Percent*, The Hill (May 24, 2026) .......... 13-14

Ole Jakob Bergfjord, *Prediction Markets as a Tool for Management of Political Risk*, 2 J. Prediction Mkts. 1 (2008) .......... 15

Order of Designation*, In re Application of KalshiEX LLC for Designation as a Contract Market* (CFTC Nov. 3, 2020) .......... 9

Paul W. Rhode et al., *Historical Presidential Betting Markets*, 18 J. Econ. Persp. 127 (2004) .......... 7, 13

Robin D. Hanson, *Decision Markets*, 14 IEEE Intelligent Sys. 16 (1999) .......... 10, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Rothera Exch. & Clearing LLC, *Designated Contract Market Rulebook* (last visited Aug. 17, 2026) .......... 28

S. Rep. No. 67-871 (1922) .......... 24-25

Scott Duke Kominers, *What Prediction Markets Actually Know*, a16z Crypto (May 30, 2026) .......... 12

Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223 (2004) .......... 17-18

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Amicus is a national trade association dedicated to preserving safe, transparent, and federally supervised access to prediction markets. Amicus believes that prediction markets offer key insights into shifting economic, cultural, and political trends and provide investment opportunities to individuals who have historically been excluded from traditional financial systems. Amicus has worked closely with policymakers and regulators to establish a consistent federal regulatory framework for prediction markets.

Amicus has an interest in ensuring that the Commodity Exchange Act (CEA) is correctly interpreted as granting the Commodity Futures Trading Commission (CFTC) exclusive jurisdiction over prediction markets. Congress has entrusted the CFTC with stewarding national financial markets to enable hedging and price discovery. As a result, the CFTC has significant experience creating clear regulatory frameworks

---

[1] This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2). No party or counsel for a party authored this brief in whole or in part, and no one other than amicus and its counsel have made a monetary contribution to fund the preparation or submission of this brief. Although Appellant Robinhood is a CPM member, Appellant Robinhood did not contribute money that was intended to fund the preparation or submission of this brief. Both parties consented to the filing of this brief.

that balance market accessibility and integrity. States have no similar experience and might remove access to prediction markets entirely. It is thus critical that courts correctly recognize that the CEA preempts state regulation of prediction markets.

## INTRODUCTION

The best decisions incorporate the wisdom of the crowd—not just the opinions of siloed constituencies. Prediction markets enable decisionmakers to gather that wisdom on an unprecedented scale. They allow anyone with an account to provide their view on the likely outcome of an event, and they offer anyone with an internet connection the opportunity to see the consensus view. And by rewarding the individuals who make correct predictions, they incentivize the acquisition of useful knowledge about everything from weather patterns to athletic events.

Over the past year, States across the country have tried to impede the progress of prediction markets by subjecting them to inapposite gambling regulations. The States' enforcement efforts must fail because the Commodity Exchange Act (CEA) vests the CFTC with "exclusive jurisdiction" over prediction markets and thereby preempts conflicting state regulations. 7 U.S.C. § 2(a)(1)(A). Those efforts are also misguided because they jeopardize valuable economic activity. Like other financial markets, prediction markets facilitate transactions between third-party buyers and sellers. In doing so, they provide economic benefits by

distributing information to the public about the likelihood of important events and allowing participants to hedge against economic risks.

Exclusive federal regulation of prediction markets is thus the only sensible approach. Recognizing as much, Congress crafted a federal regulatory system for prediction markets that strikes a balance between maximizing economic benefits and promoting market integrity. State gambling regulations—which focus on raising revenue for local development—do not address the benefits or the risks of prediction markets. And subjecting prediction markets to 50 different state regulatory regimes would have destabilizing consequences. This Court should affirm the judgment below.

## ARGUMENT

### I. PREDICTION MARKETS SERVE CRITICAL ECONOMIC FUNCTIONS

Prediction markets implement an age-old idea: the public can efficiently gather information about events of public interest by enabling individuals to obtain a monetary interest in the outcomes of those events. Although commercial prediction markets have achieved widespread use only within the last few years, they have a long history in the United States. And the overwhelming consensus among expert economists is

that properly regulated prediction markets provide significant economic benefits.

### A. History and Mechanics of Prediction Markets

Prediction markets are platforms where users trade with other users for contracts that provide payment upon the occurrence (or non-occurrence) of specified events. Justin Wolfers et al., *Prediction Markets*, 18 J. Econ. Persp. 107, 108 (2004). To facilitate the formation of a contract, platforms list a contract on an event (*e.g.*, it will rain tomorrow) for trading. Each contract includes an amount (*e.g.*, $1 per contract) to be paid when the contract resolves. Market participants then offer to "buy" or "sell" a position based on how likely they believe the event is. The platform matches buyers and sellers at a given price—for instance, if a buyer believes that there is more than a 60% chance of rain (and therefore offers to buy a contract for $.60) the platform will match a seller who believes there is a less than 60% chance of rain. Once the platform matches two corresponding orders, a total of $1 per contract is held by the platform: the buyer pays $0.60 and the seller puts up the remaining $0.40. Whoever is correct receives the $1. After the contract is executed, both parties can sell their positions to third parties at any time. CFTC,

*Understanding Prediction Markets and Event Contracts*, https://tinyurl.com/5n7e6nn2 (last visited May 25, 2026).

Accordingly, as in other futures and derivatives markets, prediction market operators play a facilitating role. Karl Whelan, *On Prices and Returns in Commercial Prediction Markets*, 23 Quantitative Fin. 1699, 1699 (2023). The platform decides what contracts will be listed in the market, matches corresponding buyers and sellers, and collects transaction fees. *Id.* In the example above, regardless of whether the buyer or the seller collects the $1, the financial result (a transaction fee) for the platform is the same. *Id.*

In addition to facilitating transactions, platforms publicly disseminate information. By posting the price of the most recent transaction as a headline, the platform conveys the market's current view of the probability of the event occurring. Justin Wolfers et al., *Interpreting Prediction Market Prices as Probabilities* 7 (Nat'l Bureau of Econ. Rsch., Working Paper No. 12200, 2006), https://perma.cc/73PM-F9X8. For instance, if the most recent rain contract sold for $.80, that reflects the market's view that the probability of rain is 80%. The last-traded price reflects the market's current view because a trade is

executed only when someone is willing to sell a contract at the highest price a buyer on the market is willing to pay or buy a contract at the lowest price a seller on the market is willing to accept. Thus, when a trade is executed, it means that the market has converged on a price that is acceptable to the highest bidder and the lowest seller.

Prediction markets have deep historical roots. Long before the advent of scientific polling, rudimentary prediction markets forecasted the outcomes of Presidential elections. Paul W. Rhode et al., *Historical Presidential Betting Markets*, 18 J. Econ. Persp. 127, 127-28, 140 (2004). In the 1860s, organized prediction markets for presidential elections emerged in several cities. *Id.* These markets eventually moved to stock exchanges, where professional brokers matched buyers and sellers in real time. *Id.* By the early 1900s, single elections sometimes elicited over $100 million in transactions—exceeding trading on the biggest exchanges. *Id.* Early prediction markets were remarkably accurate, with the "mid-October betting favorite" winning 11 of 15 Presidential elections between 1884 and 1940 and the underdog winning only 1. *Id.* at 129. Although these markets disappeared in the face of hostile state regulation, they were successful in forecasting outcomes. *Id.* at 140.

As discussed further below, the Commodity Futures Trading Commission Act of 1974 ("CFTC Act") created the CFTC and gave it exclusive federal jurisdiction over derivatives markets—thereby preempting the state regulations that had stymied their growth. Despite this, the first modern prediction market did not emerge until 1988, when the CFTC allowed the University of Iowa to operate a nonprofit venture—the Iowa Electronic Markets ("IEM")—to predict election outcomes. Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285, 286 (2008). The first modern commercial prediction market did not emerge until 2004, when the CFTC issued a license to a company that operated markets focused on economic data. *See* Jean A. Webb, Sec'y, CFTC, *Application of HedgeStreet, Inc. for Designation as a Contract Market* (Feb. 18, 2004), https://bit.ly/3QTUaDB.[2]

In 2020 the CFTC issued licenses for the first time to commercial prediction markets offering contracts on a wide range of events. *See, e.g.*,

[2] Congress has twice ratified CFTC jurisdiction over event contracts. First, in 2000, Congress defined regulated commodities within the Commodity Exchange Act to include "occurrence[s]." Pub. L. No. 106-554, App'x E, § 101, 114 Stat. at 2763A-371 (2000). Then, in 2010, Congress granted the CFTC exclusive jurisdiction over "swaps," which it defined to include event contracts. Pub. L. No. 111-203, § 722(a), 124 Stat. at 1672 (2010).

Order of Designation, *In re Application of KalshiEX LLC for Designation as a Contract Market* (CFTC Nov. 3, 2020), https://bit.ly/43R1XFh. There are now several U.S. platforms offering event contracts. Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fin. & Econ. Discussion No. 2026-010, at 8 (Bd. of Governors of Fed. Rsrv. Sys. 2026), https://doi.org/10.17016/FEDS.2026.010. In 2025, billions of dollars traded hands on prediction markets. Kaitlyn Radde, *Trading Volume on Prediction Markets Has Soared in Recent Months*, Pew Research Center (May 27, 2026), https://perma.cc/W63M-93L5.

### B. Prediction Markets Have Significant Economic Benefits

Economists have long touted the benefits of prediction markets. Almost fifteen years before the first commercial prediction market was licensed, a group of economists—including four Nobel Laureates—called on the CFTC to eliminate legal impediments to prediction markets. Kenneth J. Arrow et al., *Economics: The Promise of Prediction Markets*, 320 Science 877, 877 (2008). They explained that, with proper regulation, "[t]he range of applications is virtually limitless—from helping businesses make better investment decisions to helping governments make better fiscal and monetary policy decisions." *Id.*

The benefits of prediction markets are twofold. To start, they help solve an informational problem. Often, fragments of information about future events are dispersed across a population without incentives to pool and share them. F.A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519, 525-26 (1945). Prediction markets fill that "gaping hole in our collective intelligence" by offering a mechanism through which information in diverse locations can be aggregated and distributed. Robin D. Hanson, *Decision Markets*, 14 IEEE Intelligent Sys. 16, 16 (1999). Prediction markets also solve a risk-management problem by allowing economic actors to hedge against the risk of adverse events. Arrow, *supra*, at 877.

**1. Prediction markets help forecast events by aggregating knowledge from diverse sources**

Prediction markets allow individuals with information relevant to future events to coordinate and communicate their knowledge through price signals. Berg, *supra*, at 287. As already explained, the market price for any given event represents the market's collective belief about its probability. Economic actors who might be affected by the event can thus inspect the market and incorporate that forecast into their decisionmaking. In fact, for several reasons, economists have long agreed

that prediction markets can provide the best available information about the likelihood of an event. Wolfers, *Prediction Markets, supra*, at 108.

*First*, the market mechanism provides a simple way for diverse users from across the nation (or even the globe) to share their views. Erik Snowberg et al., *Prediction Markets for Economic Forecasting*, Brookings 6 (June 13, 2012). Different participants might base predictions on different specialized information—*e.g.,* macroeconomic factors, cultural trends, or weather patterns. The market mechanism requires them to translate that knowledge into a simple numerical form, which can be aggregated with the numbers provided by other market participants. Hayek, *supra*, at 526.

*Second*, prediction markets create a financial incentive for ordinary individuals to share (and obtain) specialized knowledge. Snowberg, *supra*, at 6. Without prediction markets, there are few opportunities for most individuals to profit from accurate predictions about, *e.g.*, weather occurrences, political elections, or world events. A prediction market can also incentivize individuals to gain expertise in predicting those events, which benefits the public. For example, before the 2024 presidential election, one market participant began conducting novel surveys to make

predictions that were more accurate than standard polling. Scott Duke Kominers, *What Prediction Markets Actually Know*, a16z Crypto (May 30, 2026), https://perma.cc/HB6Y-6TTU.

*Third*, prediction markets incentivize the collection and distribution of information about specialized areas for which information is valuable to a small number of users who otherwise cannot effectively obtain it. Diercks, *supra*, at 3. Given the expense of scientific polling—and its limited financial upside—there is little incentive to conduct polls on many subjects. But prediction market contracts have no inherent subject-matter limitations. They can thus aggregate information that would otherwise remain siloed and make it accessible to whomever finds it valuable. *Id.*

*Finally*, prediction markets aggregate and distribute information continuously and without delay. Diercks, *supra*, at 8; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (explaining how markets incorporate available information). As a result, prediction markets sometimes break major stories and provide updates on important economic events well before traditional media channels. *Id.*

The results prove what the theory suggests. As discussed, even rudimentary prediction markets in the nineteenth century accurately predicted the results of presidential elections. *See* Rhode, *supra*, at 132. And modern prediction markets perform even better—a study conducted between 1988 and 2004 concluded that the IEM beat polling 74% of the time. Berg, *supra*, at 285. More recently, prediction markets beat polling in predicting the result of the 2024 presidential election. Catherine McGrath, *Trump leads Harris on Robinhood's new prediction market with 100 million contracts traded*, Fortune (Nov. 4, 2024), https://perma.cc/N3DC-H65Y, and predicted federal funds rate changes more accurately than any other metric, Diercks, *supra*, at 3. And in another recent election, prediction markets showed the eventual winner with 95% odds at a time when polling still showed a possibly uncertain contest. Max Rego, *Kalshi Puts Paxton Odds in Texas GOP Primary at 95 Percent*, The Hill (May 24, 2026), https://tinyurl.com/y2pznf4v.

The public has now come to recognize the value of prediction markets and incorporate them into decisionmaking processes. For instance, 70% of visitors to Kalshi's website use it only to obtain information about future events—not to trade. Fox Corp., *FOX to*

*Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, Reuters (Apr. 7, 2026), https://bit.ly/4eCXACL. And multiple news agencies are integrating Kalshi data into their news, business, and weather reporting. *See, e.g.*, *id.*; Rego, *supra*.

Policymakers also recognize the informational benefits of prediction markets. Economists at the Federal Reserve explain that prediction market platforms can be a "source of real-time . . . data" for "informing monetary policy decisions." Diercks, *supra*, at 2. As a recent Federal Reserve paper explains, "prediction markets can serve as a valuable complement to existing forecast tools" because they "open new avenues for studying monetary policy transmission, market sentiment, and macroeconomic uncertainty." *Id.* at 34. That paper further projects prediction markets' "potential to enhance real-time policy analysis and academic research will only grow over time." *Id.* And the CFTC recognizes "a variety of ways . . . event contracts that involve sporting events can be used for price discovery." *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35830 (June 12, 2026).

### 2. Prediction markets allow market participants to mitigate risks

Traditionally, few people have had the tools to hedge against the risk that real-world events would disrupt their businesses and lives. Hedging was limited to individuals with the resources and ability to trade futures contracts or construct financial insurance products. And even then, hedging was largely limited to specific sectors.

Prediction markets allow users to hedge against risks in a variety of contexts. For instance, an electricity company might hedge against the cost of unexpected imbalances in its power generation. Mahdieh Shamsi et al., *A Prediction Market Trading Strategy to Hedge Financial Risks of Wind Power Producers in Electricity Markets*, 36 IEEE Trans. Power Sys. 4513 (2021), https://doi.org/10.1109/TPWRS.2021.3064277. And prediction markets may soon serve as a tool for managing risks from tax policy, regulatory shifts, or macroeconomic factors. Ole Jakob Bergfjord, *Prediction Markets as a Tool for Management of Political Risk*, 2 J. Prediction Mkts. 1 (2008).

The ability to hedge risks is likewise critical in professional sports, where wins, losses, and players' performances can have significant economic effects. Indeed, companies and individuals are already using

prediction markets to hedge sports-related risks. Most recently, a Spanish soccer club used a prediction market to hedge against the risk that it would be relegated from the top division of Spanish soccer—which would have caused it to lose millions of dollars in ticket and broadcast revenue. Liz Hoffman, *A Soccer Team Bet Against Itself. This is the (Good) Future of Prediction Markets*, Semafor (June 4, 2026), https://perma.cc/YQV8-T88B. Other teams have used prediction markets to hedge against the risk of paying performance-based bonuses. Caleb Tallman, *Kalshi's Next Bet: Institutional Hedging for Professional Sports Teams*, Gaming Today (Feb. 23, 2026), https://tinyurl.com/bdd4pnem. Teams previously met this need with traditional insurance or opaque, bespoke risk trades with Wall Street banks. But hedging through prediction markets sometimes costs a quarter of the price. *Id.*

Other businesses that are affected by professional sports have also started using prediction markets to hedge risk. For instance, a bar in New York City recently promised customers free tabs if the New York Knicks won Game 1 of the NBA Finals. Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026), https://perma.cc/J5LF-

GXEZ. The bar used Kalshi to offset the risk of loss in the event of a Knicks victory. *Id.* The last time the bar had run a Knicks-based promotion, it lost $4,000—but the Kalshi prediction allowed it to run the promotion without risking that loss. *Id.*

## II. PREDICTION MARKETS ARE NOT SPORTSBOOKS

Despite the clear benefits and distinct historical pedigree of prediction markets, some States have sought to regulate their use to predict sports-related events (and in some cases elections) as gambling. That approach is misconceived. Prediction markets offer a broad array of contracts, many of which do not relate to sports (or elections). And prediction markets do not function like sportsbooks because market operators do not play the same role as bookmakers. Moreover, any superficial similarity between prediction markets and sportsbooks would not justify subjecting prediction markets to gambling regulations.

### A. Sportsbooks Operate Differently from Prediction Markets

Bookmakers and prediction market operators play fundamentally different roles. Unlike prediction markets, bookmakers exclusively make wagers with users themselves. Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J.

223, 223 (2004). As a result, users must accept the prices that bookmakers offer. *Id.*

The mechanics of sports gambling illustrate how bookmakers generate profits in a materially different way than prediction markets. Bookmakers employ in-house experts who calculate the probability of game outcomes. *See* Martin Spann et al., *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds, and Tipsters*, 28 J. Forecast 55, 58 (2009), https://perma.cc/6BHF-FCHL. Based on those calculations, bookmakers set theoretically favorable prices. For instance, if a sportsbook calculates that the outcome of the game is 50-50, it will often offer "odds of roughly -110 on both sides." Emily Giambalvo, *Americans Can't Stop Betting. Sportsbooks are Cashing In*, Washington Post (Oct. 9, 2025), http://bit.ly/4uoJuuK. This means that users "must wager $110 to earn $100" on either team. *Id.* So even if a particular user believes the odds are 50-50, that user will be unable to place a bet that reflects those odds.

Prediction market operators do not have the same incentives or pursue the same business strategies as sportsbooks. Although prediction markets charge transaction fees, they allow users to enter contracts at

whatever odds other market participants are willing to accept. A losing prediction also makes a prediction market no more money than a winning one. And platforms lack control over contract prices, while also possessing legal obligations to provide impartial access to their contracts. *See* 17 C.F.R. § 38.151(b). Indeed, platforms *rely* on users with accurate information to bolster the accuracy of their markets' predictions. *See* Diercks, *supra*, at 2; *see also In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 9 (1st Cir. 2005) (describing how arbitrageurs enable price discovery).

These incentives remain in place even though prediction markets sometimes use market makers—high-volume trading entities that provide liquidity in nearly all financial markets by facilitating immediate buying and selling. Ananth Madhavan, *Market Microstructure: A Survey*, 3 J. Fin. Mkts. 205, 212 (2000). Market makers bear no meaningful resemblance to the "house" in a sportsbook. Market makers cannot set contract prices—they merely offer to buy or sell contracts at a given price like other users, who can undercut them. Just as market makers do not turn securities markets into gambling enterprises, they do not turn prediction markets into gambling enterprises. *See id.*; *see also Chi. Bd.*

*Options Exch., Inc. v. SEC*, 889 F.3d 837, 838 n.2 (7th Cir. 2018) (describing function of market makers in securities markets).

### B. Any Functional Similarities Between Prediction Markets and Sportsbooks Have No Legal Significance

Opponents of prediction markets often contend that prediction markets should be regulated like sportsbooks because of the supposed similarities between the two enterprises from the user perspective. *See* Ian Frisch, *Prediction Markets and Casinos Go to War Over Sports Betting*, N.Y. Times (Feb. 7, 2026), https://bit.ly/4vyK7Td. As already explained, prediction markets and sportsbooks are in fact fundamentally distinct. And many contracts on prediction markets—which relate to commodities prices, weather events, or financial data—have no relation to traditional sportsbook gambling and are unlikely to attract similar interest. But even if prediction markets and sportsbooks were outwardly functional equivalents, that would not provide States regulatory authority over both.

On the contrary, *all* federally regulated financial markets have similarities to gambling but nevertheless are immune from state gambling regulations. Indeed, "[t]he short history of financial market regulation is that everything was once illegal." Hanson, *supra*, at 18. In

the early days of the stock market, critics asserted that "Stock-jobbing, properly speaking, is only another word for Gaming." Daniel Defoe, *The Gamester: A Benefit-Ticket for All That Are Concern'd in the Lotteries* 12 (London, J. Roberts 1719). But when Congress enacted the Securities Exchange Act of 1934, it expressly preempted state gambling laws that could apply to stocks and other securities. *See* 15 U.S.C. § 78bb(a)(3) (providing that "[n]o State law" concerning "gaming contracts" can "invalidate" "securit[ies] subject to this chapter").

Futures trading was also criticized as indistinguishable from gambling. *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888). But as Robinhood explains (at 50-52), the Commodity Futures Trading Commission Act of 1974 (CFTCA) preempts the application of any state gambling law to futures contracts. 7 U.S.C. § 2(a)(1)(A).

Indeed, the CFTC exercises jurisdiction over numerous financial instruments with functional equivalents not subject to CFTC authority. For instance, a credit default swap—where Party A agrees to pay Party B if Party B's borrower defaults—is the functional equivalent of an insurance contract. But the former are regulated by the SEC or CFTC depending upon the underlying assets, 15 U.S.C. § 78c(a)(68); 7 U.S.C.

§ 1a(47), and the latter are regulated by state insurance commissions, FINRA, *Insurance Agents*, https://perma.cc/YYY8-D3EK (last visited June 6, 2026). Likewise, the CFTC has jurisdiction over commodity futures contracts—which obligate one party to buy or sell a commodity at a predetermined price on a specific date—but not over forward delivery contracts, which simply defer the date on which a commodity is shipped. *See* 7 U.S.C. § 1a(27). Thus, even if prediction markets were functionally similar to sportsbooks, that would not resolve whether prediction markets could be subject to state gambling regulations.

## III. EXCLUSIVE FEDERAL REGULATION OF PREDICTION MARKETS IS THE ONLY SENSIBLE APPROACH

The CEA gives the CFTC exclusive authority to regulate prediction markets and thereby precludes States from doing so. Robinhood comprehensively explains why statutory text and structure compel that conclusion. *See* Robinhood Br. 46-65. The same result follows from an analysis of the CEA's broader objectives. Congress carefully designed the CFTC to regulate national financial markets that provide significant information to the public but are vulnerable to manipulation. Prediction markets present those benefits and risks, and Congress therefore entrusted their regulation to the CFTC. By contrast, state gambling

regulations seek to prevent immoral behavior and generate revenue for the state and county government, but are not concerned with fostering safe, liquid national markets. Applying those regulations to prediction markets would wreak havoc on markets and their users.

### A. The CFTC Correctly Treats Prediction Markets as Productive Mechanisms for Aggregating Information

The many financial instruments that fall within the CFTC's exclusive jurisdiction have one thing in common: they "are affected with a national public interest" because, when they are "trad[ed] in liquid, fair[,] and financially secure trading facilities," they "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Congress has thus directed the CFTC to promote markets for such instruments and encourage "self-regulation." *Id.* § 5(b). When the CFTC does regulate, its goal is to "deter and prevent price manipulation or any other disruptions to market integrity." *Id.*

This calibrated regulatory system has existed since 1922, when Congress enacted the Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, to address the risks from speculation at "boards of trade." In the mid-1800s, boards of trade sprung up across the country as venues for buying

and selling contracts for the "future delivery" of grain. *See Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 245 (1905). But by the turn of the century, at least 75 percent of transactions at the largest boards of trade did not involve "physical handing over of any grain." *Id.* at 246-47. Instead, most traders speculated on the future price of grain by entering contracts and then attempting to settle them when prices moved in a favorable direction. *See id.*

The public quickly realized that speculation regarding grain futures had both benefits and risks. As the Supreme Court noted in a case involving Chicago's board of trade, it was "well known" that "[s]peculation of this kind" had "value . . . as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247. Indeed, speculation played a "crucial role in an effective and orderly futures market." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982). The Senate Agriculture Committee likewise observed that "[p]ublic speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions." S. Rep. No. 67-871, at 3 (1922). Public speculation also led to price discovery, which benefited "the producer and consumer

alike" by enabling informed decisionmaking. *Id.* at 4. At the same time, the grain-futures markets were susceptible to manipulation, which could cause "fluctuations . . . detrimental to the producer and the consumer." *Id.*

Accordingly, Congress crafted a regulatory framework that allowed speculation while seeking to prevent manipulation. Most importantly, Congress provided that grain-futures contracts could only be traded in approved "contract market[s]." 42 Stat. at 1000. To receive such approval, contract markets had to comply with recordkeeping and document preservation requirements. *See id.* Congress also charged the administrators of contract markets with preventing manipulation. *Id.*

As Robinhood explains (at 6-9), Congress subsequently established the CFTC, gave it exclusive jurisdiction to regulate futures contracts, and expanded the system to cover contracts for almost "all other goods and articles." CFTC Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395. Then, in 2010, Congress amended the Act to give the CFTC jurisdiction over markets for "swaps," which it defined to include event contracts. Dodd-Frank Wall Street Reform and Consumer Protection

Act, Pub. L. No. 111-203, § 721, 124 Stat. 1376, 1666, 1672; *see* Robinhood Br. 9-10.

In short, Congress has charged the CFTC with regulating the national markets where traders buy and sell contracts to hedge against future risks—including from the occurrence of future events—and enable price discovery. Today, the CFTC imposes several requirements aimed at ensuring that those contract markets perform their intended functions. To mitigate risk, markets may offer "only contracts that are not readily susceptible to manipulation," 7 U.S.C. § 7(d)(3), and must "have the capacity and responsibility to prevent manipulation." *Id.* § 7(d)(4). In turn, to facilitate price discovery, markets must "make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts," *id.* § 7(d)(8), and must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process," *id.* § 7(d)(9)(A). Markets must also provide qualified traders with "impartial access." 17 C.F.R. § 38.151(b).

That framework fits seamlessly with prediction markets, demonstrating why Congress entrusted these markets to CFTC

oversight. As Robinhood explains, event contracts meet the statutory definition of "swap." 7 U.S.C. § 1a(47)(A); *see* Robinhood Br. 23-31. More broadly, prediction markets function in the same way as other markets subject to CFTC jurisdiction and thus present the same benefits and risks. By allowing traders to speculate on future events, prediction markets disseminate information about those events and enable users to hedge against risks. As with other derivatives markets, prediction markets are used for both hedging and speculation. *See* Celso Brunetti & Bahattin Buyuksahin, *Is Speculation Destabilizing?* 2 (Apr. 22, 2009), https://perma.cc/UX4A-JLR5 (describing "the increased participation of speculators" in "futures markets"). And like other contract markets, prediction markets may be subject to manipulation. The CFTC's regulatory framework is designed to maximize those exact benefits and minimize those exact risks.

Because prediction markets fall squarely within the CFTC's jurisdiction, the leading prediction markets have all invested significant time and resources into developing platforms that further the CFTC's regulatory objectives. Robinhood offers sporting event contracts by partnering with two designated contract markets, both of which have

built comprehensive rulebooks governing the conduct of traders and established robust surveillance and monitoring programs to detect and penalize breaches of their rules. *See* KalshiEX LLC, *Rulebook* (last visited June 22, 2026), https://perma.cc/MDN7-QH26; Rothera Exch. & Clearing LLC, *Designated Contract Market Rulebook* (last visited Aug. 17, 2026), https://perma.cc/9HYB-CMSG.

### B. State Gambling Regulations Are a Mismatch For Prediction Markets

State gambling laws, by contrast, are ill-suited to regulating prediction markets because they do not concern themselves with fostering safe, fair markets at all. They do not address price discovery, information aggregation, risk hedging, or market manipulation. Instead, state gambling laws largely seek to balance two countervailing goals: (1) restricting supposedly immoral behavior, and (2) promoting local economic development.

Nevada's gambling laws are illustrative. In 1861, Governor James W. Nye used his first speech in office to call for a prohibition on gambling in the newly created Territory of Nevada. John L. Smith, *A Nevada Leader Who Warned Us About Our Excesses*, L.V. Rev.-J. (Mar. 19, 2011), https://perma.cc/7NH5-7ADS. "Of all the seductive vices extant," he

stated, "I regard that of gambling as the worst." *Id.* The legislature responded by criminalizing all forms of gambling. *See* An Act to Prohibit Gambling, Ch. 25, 1861 Nev. Stat. 53.

When Nevada later legalized most forms of gambling in 1931, it created a county-based licensing scheme that sought to raise revenue while simultaneously protecting consumers from the worst harms. *See* Act of March 19, 1931, Ch. 99, 1931 Nev. Stat. 165. Aspiring gambling operators could obtain a license by applying to their county sheriffs, who would collect monthly fees for each licensed game. *See id.* § 3, at 166. The law also made it a misdemeanor to operate "any cheating or thieving game or device" or to use "marked cards, loaded dice, [and] plugged or tampered-with machines or devices." *Id.* § 6, at 167.

Modern gambling laws—including those regulating online sports gambling—continue to follow that model. In Michigan, for instance, the statutes regulating sports betting aim to "protect residents of th[e] state" and "capture revenues generated from such sports betting." Mich. Comp. Laws § 432.402(d). Any person wishing to obtain a "sports betting operator license" must pay "an application fee of $50,000." *Id.* § 432.406(6). If the application is approved, the operator must "pay a

license fee of $100,000 . . . at the time the initial . . . license is issued and $50,000.00 each year after." *Id.* § 432.406(9). The "internet sports betting platform provider" must then inform users "about potential risks associated with excessive participation" and enable them to set "self-imposed limitation[s]" on their own use of the platform that will be "implemented immediately" and enforced by the platform. Mich. Admin. Code R. 432.753(1)(i), (2)(a). The concept of a "market" is simply irrelevant to these laws, and as a result, they contain no requirements related to market liquidity or integrity.

Nor do state gambling laws promote national markets. Indeed, States require licensees to offer services only to individuals physically located within the State. For instance, Michigan law provides that any "internet sports betting platform provider must utilize a geofencing system" to ensure participants are "located in th[e] state." Mich. Admin. Code R. 432.731(1), (2).

In short, state gambling laws treat regulated entities as potential sources of harm that are tolerated only insofar as they raise revenue for the State and contribute to the local economy. They do not seek to foster fair and liquid national markets for price discovery and risk mitigation.

As a result, they are a poor conceptual fit for prediction markets. Prediction markets are national (or even global) platforms that serve their purpose only if they can connect diverse users from different locations. And as discussed, they provide significant benefits to their users, as well as to the public at large. It thus makes little sense to shoehorn them into a regulatory scheme designed to tax local economic ventures to generate revenue for States but not to promote the safety and fairness of markets. Although prediction markets can be subject to the potential for market manipulation and insider trading (addressed through the CFTC regulation described above), their operators are not responsible for setting prices; therefore, they do not present the risks that state gambling laws are designed to address.

### C. Applying State Laws to Prediction Markets Would Have Detrimental Consequences

Shifting from exclusive CFTC regulation to state-by-state regulation would impose heavy costs on prediction markets and their users. Indeed, some States have purported to ban prediction markets altogether and others are likely to follow. In May 2026, Minnesota became the first State to expressly purport to ban prediction markets. *See* Minn. S.F. 4760, 94th Leg. (2026). And some States with laws

prohibiting online gambling entirely—*e.g.*, Utah—have determined that those laws apply to prediction markets. *See* Anna Betts, *'You Can Bet On It': Utah Lawmakers Form United Front in Push to Ban Prediction Markets*, The Guardian (May 18, 2026), https://perma.cc/EA9P-JWW2.

States that allow online gambling but require licenses (like Michigan) also pose a threat to prediction markets and their users. Because those States raise significant revenue from gambling licensing fees and have incumbent gambling operators that compete with prediction markets, they have a strong incentive to apply their gambling laws to prediction markets. *See* Frisch, *supra*. If those States are successful, every prediction market operator would need to apply for a license in every one of those States, an expensive process that can take more than a year. *See How to Get a Sports Betting License in the USA: A State-By-State Guide (2025)*, Sports Betting Soft, https://perma.cc/43JR-A6DE (last visited June 23, 2026). Once an operator obtains a license, moreover, it must pay annual fees ranging from $100,000 to more than $1,000,000. *Id.*

Thus, applying state gambling laws to prediction markets would risk grinding the industry to a halt. Every prediction market would need

to alter its current operations and reconfigure itself to ensure compliance with dozens of different state laws. It would then need to devote resources to preparing dozens of applications and undergoing investigations by dozens of different regulators. At the end of that process, it would need to pay tens of millions of dollars in fees annually. And in the meantime, it would need to handle periodic audit and inspection requests from different regulators.

Even if prediction markets could nominally survive the transition to 50 different regulatory regimes, that patchwork of regulation would dramatically reduce their utility. As already explained, every State that allows online gambling requires registered platforms to provide access only to individuals physically located in the State. If prediction markets were subject to these requirements, they would have to offer state-specific platforms that limit users to trading only with other residents of the States they live in. This would make it impossible to cultivate a single nationwide market and lead to different prices for the same contracts in different states.

Imposing these restrictions on prediction markets would significantly hamper their core function: aggregating information from a

wide range of diverse sources. Prediction markets rest on the premise that the best way to discover the answers to many questions is to provide different users from diverse locations with a liquid market that provides a financial incentive to share their specialized knowledge. Limiting prediction markets to individual States would frustrate this mechanism by creating more homogenous groups of traders. It could also decrease the trading volume of markets for specialized questions, as individuals interested in obscure topics will be unlikely to find others interested in trading on that topic nearby.

Applying state gambling laws to prediction markets would have particularly harmful effects on users who frequently travel. Users who place a trade in one State would not be able to exit the trade from another State. Thus, while traveling, they would be disabled from responding to new information that changes the value of their contract. That dynamic would inevitably cause some traders to lose money simply because they happened to be traveling at the wrong time. And that consequence further confirms that applying 50 different state gambling regimes to prediction markets would be profoundly destabilizing and counterproductive.

Finally, allowing States to apply their gambling laws to prediction markets would lead to an uneven regulatory environment where certain types of event contracts are treated as gambling in some States but not in others. For instance, some States (like Michigan) have focused exclusively on sporting events. *See* Robinhood Br. 14-15. By contrast, other States (like Nevada) have also taken the position that prediction markets for elections violate their gambling laws. *See* Motion for Stay at 7, *Nevada v. KalshiEX, LLC*, No. 26-1304 (9th Cir. Mar. 3, 2026), Dkt. 6.1. Without a uniform standard, there is no way to know which contracts States will target next.

* * *

Congress carefully designed the CFTC's regulatory framework to maximize the benefits of prediction markets and mitigate their risks. State gambling laws, by contrast, are blunt tools that do not address the benefits and risks of markets at all. Accordingly, exclusive federal regulation of prediction markets is the only sensible approach.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR
EPHRAIM A. MCDOWELL
ELIAS S. KIM
DEV P. RANJAN
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae Coalition for Prediction Markets*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,487 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: August 24, 2026

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

## CERTIFICATE OF SERVICE

I hereby certify that, on August 24, 2026, I electronically filed the foregoing Brief of *Amicus Curiae* The Coalition for Prediction Markets in Support of Plaintiff-Appellant and Reversal with the United States Court of Appeals for the Sixth Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: August 24, 2026

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar