No. 26-1542

# United States Court of Appeals for the Sixth Circuit

ROBINHOOD DERIVATIVES, LLC,

Plaintiff-Appellant,

v.

DANA NESSEL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MICHIGAN; JIM ANANICH, IN HIS OFFICIAL CAPACITY AS BOARD CHAIR OF THE MICHIGAN GAMING CONTROL BOARD; JONI M. THROWER DAVIS, IN HER OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; ANDREW T. PALMS, IN HIS OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; DEIDRE A. LAMBERT-BOUNDS, IN HER OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; MARK EVENSON, IN HIS OFFICIAL CAPACITY AS MEMBER OF THE MICHIGAN GAMING CONTROL BOARD; HENRY L. WILLIAMS, JR., IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE MICHIGAN GAMING CONTROL BOARD,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Michigan,
No. 1:26-cv-00730 (Maloney, J.)

**AMICUS BRIEF OF COMMODITY FUTURES TRADING COMMISSION IN SUPPORT OF PLAINTIFF-APPELLANT**

*COUNSEL LISTED ON INSIDE COVER*

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL
DAVID W. RUBIN
SENIOR ASSISTANT GENERAL COUNSEL
**U.S. COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5607
hdickman@cftc.gov

August 24, 2026

## TABLE OF CONTENTS


IDENTITY AND INTEREST OF AMICI CURIAE ... 1

INTRODUCTION ... 2

BACKGROUND ... 4

ARGUMENT ... 6

I. The CEA preempts state law as applied to transactions on CFTC-regulated exchanges ... 6

A. Express preemption ... 6

B. Field preemption ... 11

C. Conflict preemption ... 13

II. The event contracts targeted by Michigan are swaps ... 17

A. The “swap” definition encompasses sports-related event contracts ... 17

B. The district court’s theory would leave a gaping hole in federal regulation ... 23

CONCLUSION ... 26

# TABLE OF AUTHORITIES

Cases

*American Agric. Movement v. Board of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .......... *passim*

*CFTC v. Van Dyke*,
No. 1:26-cv-3369 (S.D.N.Y.) .......... 25

*CFTC v. Spagnuolo*,
No. 1:26-cv-4419 (S.D.N.Y.) .......... 25

*Chicago Mercantile Exchange, Inc. v. Selig*,
No. 1:26-cv-02157 (D.D.C.) .......... 23

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .......... 6, 16

*Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*,
579 U.S. 115 (2016) .......... 16

*Effex Capital, LLC v. National Futures Ass*'n,
933 F.3d 882 (7th Cir. 2019) .......... 2, 6, 9, 15

*Gade v. National Solid Wastes Management Ass'n*,
505 U.S. 88 (1992) .......... 12, 13

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .......... 19

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) .......... 13

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024) .......... 19

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... *passim*

*KalshiEX LLC v. Johnson*, __ F. Supp. 3d __,
2026 WL 1223373 (D. Ariz. May 5, 2026) ....................................................12, 14, 18

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)........................................................ 18

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................................................................................ 11

*Kelly v. Carr*,
691 F.2d 800 (6th Cir. 1980) .................................................................................. 10

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ..................................................................................... 6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)............................................................................................ 2, 12

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)................................................................................................ 11

*QCX v. Nessel*,
No. 1:26-cv-710, R.41 (W.D. Mich. June 17, 2026)............................................ 8, 14

*Rice v. Board of Trade of Chicago*,
331 U.S. 247 (1947).............................................................................................. 7, 8

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947).................................................................................................. 7

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988)................................................................................................ 13

*State Farm Bank v. Reardon*,
539 F.3d 336 (6th Cir. 2008) .................................................................................. 12

*United States v. Minnesota*, __ F. Supp. 3d __,
2026 WL 2150211 (D. Minn. July 27, 2026)..............................................7, 16, 18, 22

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .................................................................................. 20

*United States v. Spagnuolo*,
No. 1:26-mj-02020 (S.D.N.Y.) .......... 26

*United States v. Van Dyke*,
No. 1:26-cr-156 (S.D.N.Y.) .......... 26

Statutes

7 U.S.C. § 1a .......... *passim*

7 U.S.C. § 2 .......... *passim*

7 U.S.C. § 7 .......... 4, 12, 23

7 U.S.C. § 8 .......... 24

7 U.S.C. § 7a-2 .......... *passim*

7 U.S.C. § 13a-2 .......... 9, 10

7 U.S.C. § 16 .......... 7, 10

15 U.S.C. § 8302 .......... 20

15 U.S.C. § 8321 .......... 20

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, § 201, 88 Stat. 1389 (1974) .......... 8

Regulations

17 C.F.R. § 38.151 .......... 14

17 C.F.R. § 38.5 .......... 23

17 C.F.R. § 40.2 .......... 22

Legislative Materials

120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974) .......... 8, 11

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) .......... 20

H.R. Rep. No. 93-1383 (1974) (Conf. Report) .......... 8, 11

Hearings Before the Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark) ............................... 15

Other Authorities

Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669 (May 7, 2008) ............................................................... 4, 5

Data Reporting Requirements for Certain Event Contracts, 91 Fed. Reg. 40,102 (July 1, 2026) ................................................................... 25

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................................................21, 222

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) ..................................................1, 16, 19, 24

CFTC, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* (July 14, 2026)......................... 14

CFTC, Release Number 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026) ............................................................................ 25

CFTC Staff Letter No. 93-66 (June 18, 1993) ........................................................ 5

CFTC, *Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts* (Mar. 25, 2021)................................................................ 24

*In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download ........... 26

*In re: Self-Certification by Nadex*, Order Prohibiting the Listing or Trading of Political Event Contracts (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf ....................................................................... 24

Caleb Nelson, *Preemption*,
86 Va. L. Rev. 225, 261 (2000) ........................................................................ 11

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chicago-Kent L. Rev. 657, 692-93 (1982) ................................................................ 8

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") files this brief in support of Plaintiff-Appellant Robinhood Derivatives, LLC ("Robinhood").[1] This appeal concerns the meaning of the Commodity Exchange Act ("CEA"), which is exclusively administered by the CFTC. The United States and the CFTC are suing nine States for infringing on the Commission's exclusive jurisdiction by attempting to regulate the trading of event contracts on "prediction markets," which are CFTC-registered Designated Contract Markets ("DCMs"). The Commission is also actively engaged in significant rulemaking as to prediction markets, *see, e.g.*, 91 Fed. Reg. 35,806 (June 12, 2026), and the federal government is bringing criminal and civil enforcement actions under the CEA for abuses on prediction markets. The district court's numerous misinterpretations of the CEA, if accepted by this Court, would detrimentally undermine the Commission's jurisdiction on these and other matters. *See* Opinion, R.39, PageID.1482-1514.

[1] The Commission is also filing this brief in *QCX, LLC v. Nessel*, No. 26-1552, which will be considered by the same panel. The Commission has previously expressed its views on these matters to the Court. *See KalshiEX, LLC v. Schuler*, No. 26-3196, Dkt. 31 (6th Cir. May 12, 2026) ("CFTC-Ohio Br.") and *KalshiEX, LLC v. Orgel*, No. 26-5235, Dkt. 63 (6th Cir. June 24, 2026) ("CFTC-Tenn. Br.").

## INTRODUCTION

Congress gave the Commodity Futures Trading Commission "exclusive jurisdiction" over transactions that unfold on federally regulated derivatives exchanges. This case is about whether Michigan can invoke its gambling laws to prohibit these transactions from ever occurring. The answer is "no."

The district court, in greenlighting state intervention into trading on national derivatives exchanges, misunderstood the Commodity Exchange Act in several respects. For one, the court went deeply astray when it held that the Commission's "exclusive jurisdiction" does not preempt state law. While the CEA did not preempt state law before the Commission's creation, the Supreme Court gave Congress a recipe for how to make the CEA preemptive—and Congress followed it to a tee. And even apart from the exclusive-jurisdiction clause, Congress constructed a "comprehensive regulatory structure [for] oversee[ing] the volatile and esoteric futures trading complex" that is administered solely by the Commission. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). Thus, state law is preempted when it "directly affect[s] trading on or the operation of a futures market." *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *American Agric. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992)). A State cannot regulate—let alone prohibit—trading on a CFTC-registered exchange.

For another, the district court refused to take Congress's definition of "swap" at face value, instead relying on its own notions of the CEA's purpose and concluding that "Congress had nothing like Plaintiff's products in mind when it defined 'swap.'" Opinion, R.39, PageID.1491. That reasoning neuters the deliberate breadth that Congress employed in the "swap" definition, which goes so far as to encompass contracts that are, "or *in the future become*[], commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv) (emphasis added). The district court also feared that the Commission would have authority over "broad swaths of everyday economic activity" if sports event contracts are swaps. Opinion, R.39, PageID.1503. But "everyday" contracts are not derivatives, and in any event, the Commission has expressly disclaimed for years the authority to regulate household and consumer transactions.

The stakes of this case go well beyond sports event contracts. If the CEA is not preemptive, States could use their laws to ban or regulate any kind of swap, option, or future that trades on a national exchange. That would resurrect "the patchwork that Congress replaced wholecloth by creating the CFTC." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 230 (3d Cir. 2026). And the district court's exclusion of *sports* event contracts from the "swap" definition would necessarily result in the Commission losing jurisdiction over event contracts that have traded on CFTC-registered exchanges for years—including contracts about weather and government action—leaving behind a vacuum in federal enforcement and regulation. The Court should reject these distortions of the CEA and uphold the Commission's exclusive jurisdiction.

## BACKGROUND

The CEA provides a comprehensive framework for regulating transactions in U.S. commodity derivatives markets. The CFTC is the federal agency charged with administering and enforcing that framework. A "derivative" is simply a financial instrument—such as a future, option, or swap—whose price is "derived from" the value of something else, such as an agricultural or financial commodity. Derivatives are generally traded on CFTC-registered exchanges called Designated Contract Markets (DCMs). *See* 7 U.S.C. § 7.

Derivative markets have always been hubs of financial innovation. While agriculture futures were the starting point, futures quickly expanded to a slew of other commodities—from precious metals and currencies, to intangible measures such as the level of the S&P 500 or stock-market volatility, to carbon-emission levels. The structure of derivatives has evolved, too. As relevant here, swaps were introduced to allow counterparties to exchange cash flows based on the value of an underlying commodity, like an interest rate, exchange rate, or even the weather. *See, e.g.*, 7 U.S.C. § 1a(47)(A)(iii) (listing examples).

Event contracts are part of this tradition of innovation. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). In

1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[2] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25,670. The 2010 Dodd-Frank Act confirmed the Commission's jurisdiction over event contracts by creating a "Special Rule," which acknowledged that "[e]vent contracts" are "swaps" and granted the Commission authority to prohibit certain event contracts that are contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C).

The Commission exercises comprehensive oversight over event contracts. Among other things, it certifies DCMs, ensures that DCMs comply with the CEA's "Core Principles" to protect market integrity, engages in rulemaking around event contracts, and brings enforcement actions for insider trading and manipulative conduct around the trading of event contracts. CFTC-Tenn. Br. 17-19.

---

[2] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

## ARGUMENT

Congress gave the Commission "exclusive jurisdiction" "with respect to … transactions involving swaps … traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). That necessarily means States lack jurisdiction to regulate transactions on a DCM.

### I. The CEA preempts state law as applied to transactions on CFTC-regulated exchanges

Federal preemption comes in three varieties: express, field, and conflict. *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025). All three foreclose Michigan from enforcing its gambling laws against transactions on a DCM.

#### A. Express preemption

**1.** The CEA expressly preempts state law by conferring on the Commission "exclusive jurisdiction" "with respect to … transactions involving swaps … traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). As several Circuits have held, that language has preemptive effect. *Effex*, 933 F.3d at 894 ("[P]reemption is appropriate when application of state law would directly affect trading on or the operation of a futures market." (citation modified) (quoting *American Agric.*, 977 F.2d at 1156)); *see Flaherty*, 172 F.4th at 229 ("[A]s our sister circuits have held, the Act preempts state law purporting to regulate futures trading."); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("courts have held that [§] 2(a)(1) of the CEA preempts the application of

state law."). Rightly so. After all, if the Commission has "exclusive jurisdiction … with respect to" a transaction, other governmental authorities—including the States—necessarily lack "jurisdiction" to regulate that transaction. 7 U.S.C. § 2(a)(1)(A); *see United States v. Minnesota*, __ F. Supp. 3d ___, 2026 WL 2150211, at *18 (D. Minn. July 27, 2026) (explaining the terms "exclusive" and "jurisdiction" "reflect congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities").

The district court thought "exclusive jurisdiction" to be "odd" "verbiage" for preemption.[3] Opinion, R.39, PageID.1505. But Congress's "verbiage" is no accident. Once upon a time, the CEA did *not* preempt state law, for two reasons. First, the Supreme Court explained, there was no "declaration [in the CEA] by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 253 (1947). The Court drew a contrast to a companion case decided the same day, *id.*, which held that the United States Warehouse Act *did* preempt state law by granting the Secretary of Agriculture "*exclusive*" "power, *jurisdiction*, and authority" within a particular domain, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 224 (1947) (emphases added). Second, the

[3] The Court observed that "[o]ther provisions in the [CEA] use the terms 'supersede and preempt the application of any State or local law' in express preemption clauses" and cited 7 U.S.C. § 16(e)(2). Opinion, R.39, PageID.1505. As the Commission previously explained to this Court, that backstop provision—which preempts state gambling law even as to "excluded" or "exempted" transactions—*confirms* that § 2(a)(1)(A) preempts state gambling law. *See* CFTC-Tenn. Br. 23-27.

Court also pointed out that Section 4c of the CEA expressly "prevent[s] supersedure and preserv[es] state control in [] areas where state and federal law overlap." *Rice*, 331 U.S. at 255.

In 1974, Congress rectified both impediments. First, it created the Commission and gave it "exclusive jurisdiction" over futures trading—just like the Warehouse Act. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (1974) (codified at 7 U.S.C. § 2(a)(1)(A)). Second, the 1974 Act also removed Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). "These amendments established independent evidence of congressional intent to displace any state regulatory role," as "they wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading."[4] Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 692-93 (1982).

**2.** The rest of § 2(a)(1)(A) confirms the preemptive nature of the exclusive-jurisdiction clause. The very next sentence states that "[e]xcept as hereinabove provided," the CEA does not "supersede or limit the jurisdiction at any time conferred

---

[4] In the *QCX* case, the district court rejected the analogy to *Santa Fe Elevator* because there, Congress "repeal[ed] [] express language making federal law subordinate to the states" and "unequivocal[ly] indicat[ed] in a senate report that the intention of the new language was to occupy the field of regulation." *QCX v. Nessel*, No. 1:26-cv-710, R.41, PageID.1120 (W.D. Mich. June 17, 2026). But those points are true of the modern CEA: Congress "repeal[ed]" Section 4c's preservation of state authority and "unequivocal[ly] indicat[ed] in a [conference] report that the intention of the [exclusive jurisdiction] language was to occupy the field of regulation." *Id.*; *see infra* 10-11.

on … regulatory authorities under the laws of … any State" or "restrict" state authorities "from carrying out their duties and responsibilities." 7 U.S.C. § 2(a)(1)(A). That savings clause makes sense only if state law is otherwise preempted by the "exclusive jurisdiction" clause. *See Effex*, 933 F.3d at 894 (preemption follows from "both the savings clause and the jurisdictional clause"). Indeed, if state law is *not* otherwise preempted by the "exclusive jurisdiction" clause, the savings clause is pointless.

The Seventh Circuit explained as much in *American Agriculture*. "Standing alone," the exclusive-jurisdiction clause "would appear to grant exclusive authority to the Commission over cases involving futures contracts, and to completely preempt state law as a result." 977 F.2d at 1155. But of course, the savings clause must "retain [some] meaning," and thus, "[g]iving full effect to both clauses compels the conclusion that Congress intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading." *Id.* Specifically, where state law would affect "the actual operation of the commodity futures markets," or "would directly affect trading on or the operation of a futures market," that law is preempted. *Id.* at 1156. The enforcement of state gambling law to prohibit an entire class of derivatives from being offered easily clears that threshold.

**3.** Beyond § 2(a)(1)(A), the CEA contains several additional indicia of preemptive intent. Section 13a-2(1) empowers a State to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that States

generally lack authority to apply their *own* laws to CFTC-regulated transactions.[5] And even when purporting to enforce the CEA, States cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot directly regulate CFTC-registered prediction markets. Likewise, Section 16(e) provides for concurrent federal and state jurisdiction over *off-DCM* futures transactions. 7 U.S.C. § 16(e)(1)(B)-(C). Yet Congress did not allow state law to apply to *on-DCM* transactions, as Michigan seeks to do here.

**4.** The history behind the CFTC's creation confirms all this. As the Seventh Circuit has recounted, "[t]he Act's proponents were concerned that the states, in light of [contemporaneous] circumstances, might step in to regulate the futures markets themselves. This, they feared, might have subjected the national futures trading apparatus to conflicting regulatory demands," and "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric.*, 977 F.2d at 1156. This Court has likewise recognized that "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states." *Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980). So Congress designed the "exclusive grant of jurisdiction to the Commission" to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State

[5] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws.

law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Report).

So text, context, and history all agree that the Commission's "exclusive jurisdiction" over transactions on a DCM preempts state-law interference.

**B. Field preemption**

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018). "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

Here, Congress gave the Commission "exclusive jurisdiction" over "swaps … traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided"—that is, *except* where the Commission has exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A). This "jurisdictional rule[]" establishes "that states may not regulate certain areas of conduct" and therefore is "of the sort typically associated with 'field' preemption." Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 (2000); *see also* H.R. Rep. No. 93-1383, at 35-36 ("exclusive grant of jurisdiction" designed to "preempt the field insofar as futures regulation is concerned"). Congress also deleted from the CEA language that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974).

DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, register with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of" trading on a DCM, "leaving no room for state regulation." *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *6 (D. Ariz. May 5, 2026); *see Curran*, 456 U.S. at 356 (CEA creates "comprehensive regulatory structure"). The upshot is that the field of "the regulation of trading on a DCM" is comprehensively occupied by federal law, preempting Michigan's intrusion. *Flaherty*, 172 F.4th at 229.

The district court rejected field preemption because the CEA contains a handful of narrow carveouts for state involvement. Opinion, R.39, PageID.1508. But the district court identified no CEA provision that allows *state law* to regulate *trading on a DCM*. Section 13a-2(1) allows States to enforce the CEA, not state law. Section 13a-2(7) allows States to enforce general civil or criminal antifraud laws, not to substantively regulate trading. *See State Farm Bank v. Reardon*, 539 F.3d 336, 344 (6th Cir. 2008) ("state laws that have a direct impact on the banking and activities of a federal savings association" preempted despite statute "preserv[ing] state laws of general applicability"). And Section 2(a)(1)'s savings clause, as noted above, only applies "except" with respect to "transactions … on [designated] contract markets." 7 U.S.C. § 2(a)(1)(A). Indeed, the Supreme Court has observed that a savings clause can *underscore* that a statute is preemptive within its domain, which is the case here. *See, e.g.*, *Gade v. National Solid*

*Wastes Management Ass'n*, 505 U.S. 88, 100 (1992) (finding field preemption notwithstanding savings clause, which would otherwise be "superfluous").

The district court also held that the CEA cannot preempt the field of on-DCM trading because "state contract law is foundational to the entire enterprise of contract markets." Opinion, R.39, PageID.1509. Even assuming that premise *arguendo*, Congress often broadly preempts areas in which state contract law operates in the background. For example, the Natural Gas Act "confers upon [the Federal Energy Regulatory Commission] exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale," which "occupie[s]" the "field" "to the exclusion of state law." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988). Even so, "every state statute that has some indirect effect on rates and facilities of natural gas companies is not pre-empted." *Id.* at 308; *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-39 (1990) (holding that ERISA's broad preemption rule for employee benefit plans nonetheless has "limits," such as "a State's general garnishment statute"). The "effect" of Michigan gambling law, "however, is not indirect'"—its "central purpose is to regulate matters that Congress intended [the CFTC] to regulate." *Schneidewind*, 485 U.S. at 308-09.

### C. Conflict preemption

Finally, both forms of conflict preemption, impossibility and obstacle, apply.

**1.** As for impossibility, federal law requires a DCM to provide "impartial access to its markets and services" and to follow "[a]ccess criteria that are impartial,

transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). The district court faulted the Commission for not "offer[ing] a coherent theory of what 'impartial access' means." *QCX*, R.41, PageID.1124. Simple: Offering derivatives to residents of one State, but not of another State, "discriminat[es]" based on residency. 17 C.F.R. § 38.151(b). So if state law restricts Michiganders' access to event contracts, it is irreconcilable with the impartial-access rule. *See Johnson*, 2026 WL 1223373, at *8 (state ban would require DCM to "exclude Arizona residents" in violation of impartial-access rule).

From there, additional conflicts spawn. For instance, a Michigan state court recently ordered a DCM, Kalshi, to unwind previously executed trades involving Michigan residents, which required Kalshi to seek an emergency rule change so that it could force-liquidate open positions. *See* CFTC, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* (July 14, 2026) at 1-4. To ensure the integrity of its markets, the Commission stayed the rule change and ordered Kalshi to "fulfill the trades in question in accordance with its normal practices." *Id.* at 1. As the Commission explained, the rule change "would risk shattering public confidence by giving traders cause to worry that the trades they execute today may be unwound a week—or a year—later." *Id.* at 7. So on this score too, state law puts DCMs in an impossible bind with their federal obligations.

**2.** More fundamentally, subjecting CFTC-regulated markets to state-by-state requirements would stand as an impermissible obstacle to federal regulation. "As

Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric.*, 977 F.2d at 1156. Thus, allowing States to regulate event contracts could reintroduce the "total chaos" Congress sought to prevent by granting the Commission exclusive jurisdiction over futures trading in 1974.[6]

Courts have held that the CEA obstacle-preempts far less. In *Effex*, a trading firm filed defamation and other tort claims against the National Futures Association, a self-regulatory organization registered under the CEA. 933 F.3d at 888-89. The Seventh Circuit held those claims preempted: "If a member could challenge the NFA's discipline and disciplinary process through a state-tort claim, the NFA's capacity to discipline its members … for violating its rules would be impaired significantly." *Id.* at 894. "The resulting obstacle to Congress's purposes in creating federal regulations overseeing the national commodities futures market is obvious." *Id.* at 895. If it is "obvious" that state defamation claims against a self-regulatory organization are preempted, it is hard to see how state enforcement actions to forbid an entire class of derivatives would not also be preempted.

The district court disagreed, applying a presumption against preemption on the ground that "regulating gambling activity is at the heart of states' police powers."

[6] *See* Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

Opinion, R.39, PageID.1510; *see also* PageID.1493. This was error. For one, when a "statute contains an express pre-emption clause," as the CEA does, "[the court] do[es] not invoke any presumption against pre-emption." *Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016); *Minnesota*, 2026 WL 2150211, at *10 ("When Congress has expressly preempted state legislation, courts do not apply any 'presumption against preemption.'"). For another, derivatives contracts are traditionally regulated by the CFTC, not the States. *Flaherty*, 172 F.4th at 230 (rejecting presumption against preemption because "the federal government has regulated the derivatives market for over a century" and the CEA's "text preempts state gambling laws that seek to regulate futures trading"). And while intrastate gambling may be a traditional area of state regulation, the same is not true of "interstate gambling," so the gambling presumption would not apply to national exchanges anyway. *Churchill Downs*, 162 F.4th at 641 n.5.

The district court also viewed the Special Rule to "suggest[] that Congress contemplated markets segmented by state" since event contracts involving "'activity that is unlawful under any Federal *or State* law'" can be prohibited by the Commission. Opinion, R.39, PageID.1511 (emphasis in original) (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)(I)). But the Special Rule does not allow the banning of event contracts in some States but not others. Rather, if an event contract is found to "involve" "activity that is unlawful under any … State law" and to violate the public interest, that contract is prohibited *everywhere*. *See* 91 Fed. Reg. at 35,822.

* * *

If the CEA does not preempt state gambling laws as applied to transactions on CFTC-regulated DCMs, that would be a massive sea change. Under that interpretation, States could regulate not just sports event contracts, but any type of swap—including basic interest-rate or currency swaps—as well as futures and options. That is the antithesis of the scheme Congress created; indeed, Congress created the CFTC in substantial part to avoid state interference with derivatives markets. *American Agric.*, 977 F.2d at 1156. Whether on express, field, or conflict grounds, Michigan's enforcement of state gambling law as to on-DCM transactions is preempted.

## II. The event contracts targeted by Michigan are swaps

### A. The "swap" definition encompasses sports-related event contracts

The CEA's definition of "swap" encompasses "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Sports-related event contracts straightforwardly satisfy this definition. See *Flaherty*, 172 F.4th at 227-28 ("Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

**1.** For starters, event contracts make "payment … dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Consider an event contract over whether the Detroit Lions will defeat the Chicago Bears. "[P]ayment" under that contract is plainly "dependent on the occurrence … of an event"—namely, the Lions defeating the Bears. Likewise, a "yes" position on the Lions winning by more than 3.5 points is "dependent on … the extent of the occurrence of an event"—the extent of the Lions' victory. *See Johnson*, 2026 WL 1223373, at *4 (explaining that the phrase "extent of the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

Sports events, moreover, are "associated with potential financial, economic, or commercial consequences," 7 U.S.C. § 1a(47)(A)(ii), as they have the "potential" to affect "numerous … stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227-28; *see* CFTC-Tenn. Br. 5-7 (identifying examples). Of course, the financial, economic, or commercial consequences of an event may not always be felt "right away"—indeed, they may never actually occur—but an event contract nonetheless remains a swap so long as there is *potential* for commercial ramifications. *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026); *see Minnesota*, 2026 WL 2150211, at *12 ("The occurrence of the event in question does not have to ultimately result in a financial, economic, or commercial consequence to meet the definition. It is enough that such consequences

are foreseeable future possibilities.”). Because sports events are associated with potential economic consequences, contracts based on those events are swaps.

**2.** The district court took a different approach. Supposing that interpreting the term “swap” as Congress defined it “would render it meaningless,” Opinion, R.39, PageID.1487, it instead resorted to the “purpose and context” of the CEA, concluding that “Congress had nothing like Plaintiff’s products in mind when it defined ‘swap.’” *Id.* PageID.1491. That reasoning goes wrong in several respects.

*First*, it is black-letter statutory interpretation that courts “cannot replace the actual text with speculation as to Congress’ intent.” *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). That is particularly so here, as there are several indicia that Congress *did* intend to give the Commission jurisdiction over event contracts, including those related to sports. Specifically, the CEA’s Special Rule gives the Commission jurisdiction over “[e]vent contracts,” which includes “swaps” that “involve” “gaming.” 7 U.S.C. § 7a-2(c)(5)(C)(i). And since “‘gaming’ includes the activity of playing games and playing games for stakes,” “event contracts related to … sporting events … implicate the gaming category.” *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024); *see* 91 Fed. Reg. at 35,825-26 (proposing definition of “gaming” under the Special Rule that encompasses sports).

The legislative history confirms this. When debating the addition of the Special Rule in 2010, Senator Blanche Lincoln—then the Chair of the Commission’s authorizing committee—stated that “[i]t would be quite easy to construct an ‘event

contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010). It was thus contemplated that a market might develop around sports event contracts that would fall within the Commission's jurisdiction—and Congress codified that expectation in the Special Rule.

*Second*, the district court ignored Congress's deliberate effort to write a sweeping "swap" definition. *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (Congress "defined 'swap' broadly."). Not only is the § 1a(47)(A)(ii) language broad, but Congress also provided that a contract "that is, or in the future becomes, commonly known to the trade as a swap" is a swap, 7 U.S.C. § 1a(47)(A)(iv), as is "any combination or permutation of, or option on," enumerated categories of swaps, *id.* § 1a(47)(A)(vi). And Congress still worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" in order to avoid "eva[sion of] this subtitle." 15 U.S.C. § 8321(b); *see also id.* § 8302(d)(1) (CFTC and SEC have authority to "further define the term[] 'swap'"). So even if "Congress had nothing like [sports-related event contracts] in mind when it defined 'swap,'" Opinion, R.39, PageID.1491, Congress clearly did not intend to limit the "swap" definition to the contracts it had "in mind."

*Third*, the district court fretted that if the plain text of the "swap" definition applied, "service contracts," "mortgages," and "prenuptial agreements," "among others" would be "swaps." *Id.* PageID.1495. But like any derivative, a swap is a contract

based on the value of some external underlying commodity. "[S]ervice contracts" and "prenuptial agreements" are not derivatives; they are simply ordinary contracts. And in edge cases, the Commission has statutory authority to exclude everyday contracts from the definition of swap—as it did for "mortgages" as well as insurance contracts. *See* 77 Fed. Reg. 48,208, 48,212, 48,246 (Aug. 13, 2012) (excluding from "swap" definition "products historically treated as insurance products" and consumer transactions entered into "primarily for personal, family, or household purposes," including "mortgage" agreements); *see Flaherty*, 172 F.4th at 228 ("In such far-fetched scenarios, Congress's express delegation to the CFTC and the Securities and Exchange Commission to 'further define' swaps would prove useful.").

Nor does a faithful interpretation of the "swap" definition subject casino-style gambling to CFTC jurisdiction. A true sports bet, for instance, is a bilateral transaction between the bettor and a "house," where the price (*i.e.*, the betting line) is set by the "house" rather than by market forces of supply and demand. Such bets are therefore not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants.[7] *See* 7 U.S.C. § 2(e). Event contracts, by contrast, trade on a neutral exchange that matches counterparties and collects transaction fees, like other futures

---

[7] An exchange is a "trading facility," and Congress excluded from the definition of "trading facility" a platform that allows "participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(B)(i). Casino-style sportsbooks fit this exclusion.

and swaps exchanges.[8] That the latter are within the Commission's jurisdiction does not demand the same of the former.

In short, the district court's "effort to limit the scope of the CFTC's jurisdiction to trades that focus on traditional commodities futures ignores the plain language of the statutory definition of swap, which has no such limiting language." *Minnesota*, 2026 WL 2150211, at *13. The Court should hold that sports event contracts are "swaps" under the CEA's plain text.

**3.** To the extent there remain disputes about whether individual contracts meet the "swap" definition in § 1a(47)(A)(ii), gambling lawsuits are not the proper mechanism for adjudicating them. The CEA contains a self-certification process by which a potential contract becomes eligible for trading on a DCM as a swap. 7 U.S.C. § 7a-2(c)(1). Thus, "[i]f a DCM has a view that a particular product is a [swap] contract, it may self-certify the contract consistent with that view." 77 Fed. Reg. at 48,303. If that certification is false (*i.e.*, the contract is not actually a swap), the CEA gives *the Commission* authority to prohibit it. *See* 7 U.S.C. § 7a-2(c)(5)(B); 17 C.F.R. § 40.2(c). That process would be undercut if a State could collaterally attack a DCM's self-certification by invoking its gambling laws. Rather, a party aggrieved by a DCM's self-certification

[8] Trading facilities "accept[] bids or offers made by other participants that are open to multiple participants in the facility or system" or "through the interaction of multiple bids or multiple offers within a system with a pre-determined nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). CFTC-regulated derivatives exchanges fit this mold.

should avail itself of the remedies provided by the CEA and Commission regulations and, if necessary, file an APA action. *See, e.g.*, *Chicago Mercantile Exch., Inc. v. Selig*, No. 1:26-cv-02157, Dkt. No. 1 (D.D.C. June 18, 2026) (APA claim against the Commission for allowing perpetual futures contracts to trade as futures rather than as swaps).

### B. The district court's theory would leave a gaping hole in federal regulation.

If sports event contracts are not "swaps," that does not simply mean Michigan can regulate them; it means the CFTC *cannot* regulate them. And nothing about the district court's conception is confined to sports. If the Dodd-Frank Congress did not have sports event contracts "in mind," Opinion, R.39, PageID.1491, then neither did it consider event contracts concerning elections or geopolitical events. So the district court's reasoning would exclude those contracts from CEA coverage, too.

That would leave a massive regulatory vacuum. Event contracts, for all their advantages, pose significant risks of manipulation, and the CEA provides a comprehensive framework for mitigating potential abuses. For instance, DCMs that offer event contracts must comply with various core principles: they can only list "contracts that are not readily susceptible to manipulation," and they must have capacity to prevent market disruption, publish transaction data, ensure financial integrity in transactions, enforce disciplinary rules, and keep records. 7 U.S.C. § 7(d). The Commission can investigate compliance with these principles, 17 C.F.R. § 38.5, and

when necessary, it can suspend or revoke the designation of a contract market, 7 U.S.C. § 8(b). No federal agency can enforce these protections if event contracts are not swaps.

The CEA also equips the Commission with further tools to safeguard market integrity around event contracts subject to its jurisdiction. Under the Special Rule, it may prohibit event contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C). To that end, the Commission has proposed rulemaking deeming certain event contracts presumptively against the public interest—such as sports contracts based on player injuries, fights, and officiating outcomes, or contracts that pose national-security risks or are based on games of random chance. *See* 91 Fed. Reg. at 35,834-37. The Commission has previously exercised its Special Rule power to prohibit the North American Derivatives Exchange from offering structurally analogous event contracts involving election outcomes,[9] and under the prior Administration, the Commission was poised to ban NFL-related event contracts.[10] All this is contingent on event contracts coming within Commission's jurisdiction in the first place.

---

[9] *In re: Self-Certification by Nadex*, Order Prohibiting the Listing or Trading of Political Event Contracts (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

[10] Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (Mar. 25, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521.

The Commission is engaged in additional rulemaking concerning event contracts. The CFTC and the SEC have issued a joint request for comment on definitional and regulatory clarity with respect to swaps. CFTC, *Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance*, RIN 3038-AF71 (June 18, 2026). The CFTC also issued a Notice of Proposed Rulemaking concerning data-reporting requirements for certain event contracts, *see* 91 Fed. Reg. 40,102 (July 1, 2026), and most recently, it announced proposed rulemaking concerning affiliations between CFTC-regulated entities that would address issues concerning perceived and potential conflicts of interest. CFTC, Release No. 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26.

In addition, the Commission may bring enforcement actions for violations of the CEA or its regulations with respect to "any swap." 7 U.S.C. § 13a-1(a). Accordingly, the Commission has brought enforcement actions against individuals who illegally traded event contracts based on insider information, and these actions are predicated on the event contracts being subject to the CEA. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (enforcement action against U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (enforcement action against Google employee who used nonpublic information to trade

event contracts related to Google's Year in Search list). The United States has also brought commodity-fraud charges against these persons—which, again, presupposes CEA coverage. *See United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.). Further, the Commission can penalize persons who offer retail event contracts without registering as a DCM—indeed, the Commission fined Polymarket and ordered it to wind down its operations in the U.S. in 2022 for offering "swaps as defined by Section 1a(47) of the [CEA]" without registering with the Commission.[11] None of this oversight would be possible if event contracts fall outside the CEA. *See, e.g.*, *Van Dyke*, No. 1:26-cr-156, Dkt. No. 23 at 6-21 (S.D.N.Y. July 31, 2026) (moving to dismiss commodity-fraud charges on grounds that geopolitical event contracts are not "swaps").

In short, the district court's approach to defining "swap" would not merely permit States to apply their gambling laws against and collect revenue from federally regulated DCMs. It would rip significant regulatory authority from the federal government in favor of 50 state-level gambling commissions, leaving in its wake a tremendous vacuum in policing against market manipulation and abuse.

## CONCLUSION

The Court should reverse and direct entry of a preliminary injunction.

---

[11] *In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download.

Dated: August 24, 2026

Respectfully Submitted,

*/s/ Henry J. Dickman*
Henry J. Dickman

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
DAVID W. RUBIN
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 418-5607
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
drubin@cftc.gov

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,431 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1)).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

*/s/ Henry J. Dickman*

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system and thereby served all participants in the case who are registered CM/ECF users.

*/s/ Henry J. Dickman*